LESTER W. CARPENTER, Administrator of Estate of ALICE POWELL GILMORE, and WILLIE POWELL and ALICE DOWDY v. F. N. KENDRICK and W. R. CLARK, Appellants.

Division One, June 8, 1923.

1. **NOTE: Presumption of Payment: After Twenty Years.** After the lapse of twenty years from the maturity of a note, or the last proven payment thereon, or acknowledgment thereof by the debtor, there arises a legal presumption of payment, in the absence of such circumstances as the insolvency of the maker, or his absence from the country, and the like. The presumption is one of law, and while it is not conclusive, and may be overcome by showing that the note has not been paid, the presumption increases, and more persuasive circumstances are required to rebut it, as the age of the note after twenty years increases.

2. ———: ———: **Admission of Co-Obligee.** The legal presumption that a note is paid twenty years after maturity is not rebutted by the admission of non-payment by one of two co-obligees.

3. ———: ———: **Admission by Heir: In Written Settlement.** A statement by the daughter of the maker of a note, whose property, inherited from him, is sought to be held for its payment, that she and her brother expected to pay the note, is not an admission that it was unpaid, especially when such statement was made in an effort to compromise with the payee. And a statement made by her in a written contract of settlement that the note was not paid and that it was a valid and subsisting debt, is not an admission that the note had not been paid.

4. ———: ———: **Credits: Limitations.** The note, due one day after date, bore ten per cent compound interest, and was dated August

5, 1872, and bore credits:   March 3, 1885, $200;   March 7, 1895, $10;   March 1, 1904, $5.   The maker died in 1912.   No effort was made to collect it during the forty years of his lifetime, though he was amply able to pay it.   *Held*, that the note is presumed to have been paid, and such presumption is not rebutted by the credits or by any substantial evidence that it was not paid; and the evidence being insufficient to show any payments thereon within ten years, it was barred by the Statute of Limitations.

5.   ———-:   Compromise Settlement: Incapacity: Deference to Trial Court.   It is unnecessary to decide whether a claim made in good faith by the payee that the note had not been paid was sufficient to support a compromise settlement and written agreement to pay it made by the daughter of the maker after his death, where she did not have sufficient mental capacity to understand the nature of the transaction and said agreement was void for that reason; and where the evidence on that issue was mostly oral, and the weight of it depended largely upon the character, intelligence, opportunity for observation and various qualifications of the witnesses this court will defer somewhat to the findings of facts of the trial chancellor, and unless satisfied that his conclusion is against the weight of the evidence will adopt it, as is done in this case.

6.   ———:   ———:   Incapacity of Maker: Opinion or Fact: Founded on Observation.   Testimony of witnesses who knew from her girlhood the maker of the compromise written contract by which she agreed to pay the note of her deceased father, then more than forty years past due, and testify, from their association with and observation of her, that she did not have sufficient mental capacity to transact important business and had never had any business experience, and speak of her mental condition more as a matter of fact than as mere opinion, is competent, and is sufficient for setting aside the contract, though they do not testify to any insane act or any act showing a weak mind on her part.   Such testimony, founded on actual observation, is knowledge of the fact.

7.   ———:   ———:   ———:   Erratic Conduct.   Besides, in this case, where the daughter had never transacted any business of consequence, and her only brother was equally obligated to pay the old note of their deceased father, if either was, and he had in writing proposed to the payee of the note to settle the matter by arbitration, her erratic conduct, in not following her brother and the administrator of her father's estate and nephew, and in suddenly going off by herself with the payee of the note and signing an elaborate contract in which she admitted her father's note to the amount of more than $6,000 was a valid and subsisting debt

and promised to pay it and secured its payment by a deed of trust on her land, without letting them know anything about what she proposed to do, and without the presence of an attorney or other disinterested friend, shows of itself that she did not have mental capacity to fully appreciate the nature of the transaction or to withstand the dominating force and influence of the payee over her in making said settlement.

Appeal from Cooper Circuit Court.—*Hon. John G. Slate,* Judge.

Affirmed.

*W. E. Owen* and *Ross E. Feaster* for appellants.

(1) The law favors compromises and settlements. Cullen v. Ins. Co., 126 Mo. App. 412. When a right is disputed and a compromise ensues, that compromise will not be disturbed should it turn out afterwards that one of the parties had no right at law. Such a principle would overthrow all compromises. The compromise of a doubtful claim is a good consideration for a contract. Reilly v. Chouquette, 18 Mo. 226. (2) The compromise of the claim against the estate of W. O. Powell, whether barred or not, constituted good and sufficient consideration for the note and deed of trust. Wood v. Telephone Co., 223 Mo. 565; Gentry v. Field, 143 Mo. 399; Glover v. Cheatham, 19 Mo. App. 656; Reilly v. Chouquette, 18 Mo. 220; Hill v. Coal Co., 124 Mo. 153; Rinehart v. Bell, 82 Mo. 534; Livingston v. Dugan, 20 Mo. 102; Mullanphy v. Riley, 10 Mo. 48. (3) A debt barred by limitation is sufficient consideration. Glover v. Cheatham, 19 Mo. App. 656. A conveyance of property in payment of a note which is barred by limitation is supported by a valuable consideration. Gentry v. Field, 143 Mo. 399. (4) Mutual and concurrent promises furnish consideration for each other; the fact that one is executory makes it none the less binding. Chenoweith v. Express Co., 93 Mo. App. 185; Gennett v. Gilbert, 83 Mo. App. 411. (5) The right of either party to refuse to adjust and finally

299 Mo.—.7.

settle an account until its correctness is accepted by the other, is of itself a consideration for any settlement effected. McCormick v. St. Louis, 166 Mo. 315; Reilly v. Chouquette, 18 Mo. 220. (6) The compromise of a doubtful claim asserted in good faith is a valuable consideration to support a promise. Mullanphy v. Riley, 10 Mo. 48; Reilly v. Chouquette, 18 Mo. 220; Livingston v. Dugan, 20 Mo. 102; Rinehart v. Bell, 82 Mo. 534; Hill v. Coal Co., 124 Mo. 153. (7) A moral obligation is a sufficient consideration when based on a prior legal obligation. Farmers & Merchants Bank v. Redmond, 119 Mo. App. 18; Hallock v. Brier, 80 Mo. App. 331; Greenbaum v. Elliott, 60 Mo. 25; Eastley v. Gordon, 51 Mo. App. 637. (8) However valid a claim may be, if there is an honest belief by the debtor that it is invalid, it may be compromised. Milling Co. v. Ins. Co., 105 Mo. App. 146. (9) A threatened lawsuit, civil in character, is not duress and will not avoid a contract entered into, to avoid such suit. Wood v. Telephone Co., 223 Mo. 557; 8 Cyc. 523. Duress, in its more extensive sense, is that degree of constraint or danger, either actually inflicted, or threatened, or impending, which is sufficient in severity or in apprehension to overcome the mind and will of a person of ordinary firmness. Wood v. Telephone Co., 233 Mo. 558. (10) It is not the existence of undue influence but the exertion of it in the procurement of the instrument, that invalidates it; and the evidence must show that such undue influence was actually exercised at the time of the execution or procurement of such instrument. Fible v. Kamp, 154 Mo. 545; Sutherland v. Hood, 84 Mo. 293; McFadden v. Catron, 130 Mo. 252, 138 Mo. 197. Undue influence cannot rest on suspicion. There must be proof of undue influence itself, and to be effective it ought to be sufficient to destroy the free agency of the testator at the time of making the instrument. Teckenbrock v. McLaughlin, 209 Mo. 551. (11) The ground of cancellation must be clearly and positively established by complainant. Bryan v. Hitchcock, 43 Mo. 527; Jackson v. Wood, 88 Mo. 70. (12) Where no con-

fidential relation exists, the burden is on plaintiff to prove that the grantor in the deed was incapacitated to make it. Cohron v. Polk, 252 Mo. 278; McDennett v. Keister, 240 Mo. 290.

*George F. Longan* and *D. E. Kennedy* for respondents.

(1) Did Alice Powell have the mental capacity to execute the contract, and was she capable of understanding her rights without independent advice, and did W. R. Clark, having the superior knowledge, act in good faith? 1 Black on Rescission of Contracts, secs. 40, 41, 106, 107, 108, 249; Turley v. Edwards, 18 Mo. App. 676, 683; McClure v. Lewis, 72 Mo. 314; Bell v. Campbell, 123 Mo. 1; Turner v. Overall, 172 Mo. 261; Ridgeway v. Herbert, 150 Mo. 618; Martin v. Baker, 135 Mo. 495; Jones v. Belshe, 238 Mo. 524; Cornett v. Cornett, 248 Mo. 184, 235; Davenport v. Cosey, 222 S. W. 794; Story's Equity (14 Ed.) sec. 339. (2) The reality of the claim is not measured by the state of the law, but by the state of the knowledge of the person making the concession. 9 Cyc. 340-341; 13 Corpus Juris, 346. (3) Forbearance to sue will not avail where the right of action no longer exists. Long v. Towl, 42 Mo. 545; Corbyn v. Brokmeyer, 84 Mo. App. 649, 653; Osborne v. Fridich, 134 Mo. App. 449; Swaggard v. Hancock, 25 Mo. App. 596, 647; Land Company v. Lumber Co., 136 Mo. App. 181; Heck v. Watkins, 183 S. W. 354; Briscoe v. Kenealy, 8 Mo. App. 76; Warren v. Bishop, 22 Vt. 607; Brown v. Tarkington, 3 Wall. 377; Fryar v. Cetner, 72 N. W. 909; Taylor v. Weeks, 88 N. W. 366; Nicholson v. Neary, 137 Pac. 492; Roberts v. Parsons, 242 S. W. 595; 12 Ruling Case Law, 309. (4) A moral obligation is not sufficient unless supported by a prior legal obligation. Terry v. Terry, 217 S. W. 842, 845. (5) Where the evidence is conflicting the appellate court is not disposed to overturn the finding of the chancellor who tried the case. Cook v. Smith, 124 Mo. App. 561, 566; Nichols v. Wimer, 230 S. W. 345; Cherry v.

Cherry, 258 Mo. 403. (6) Was Clark's claim against the estate of William O. Powell doubtful, and did Clark know the facts? Clark v. Powell Estate, 208 S. W. 31.

SMALL, C.—Suit in equity to cancel note and deed of trust made by Alice Powell, deceased, to defendant, F. L. Kendrick, Trustee, and W. R. Clark, beneficiary, dated January 31, 1913.

The plaintiffs had judgment, from which defendants duly appealed to this court.

The grounds alleged in the petition for cancelling said instruments are want of consideration, duress, undue influence, fraud and false representations on the part of the defendant Clark, and want of mental capacity on the part of said Alice Powell in the execution thereof. All of which are put in issue by the answer.

The controversy grows out of a note for $200 dated August 5, 1872, due one day after date, with interest from date to be compounded annually, at the rate of ten per cent per annum, until paid, given by W. O. Powell, the father of said Alice Powell, who died in the year 1912, to the defendant Clark. The Powells and Clarks were farmers and neighbors and friends living in Pettis County. Powell had a farm of about 350 acres and was fairly well to do—and Clark was very well to do, a farmer and money lender. The note was given for a horse Clark sold to Powell. After Powell's death, Clark claimed the note had never been paid, that it had been kept alive by payments made thereon by Powell, as follows; March 3, 1885, $200; March 7, 1895, $10; and March 1, 1904, $5. Clark presented and filed said note on April 23, 1913, in the probate court against the estate of said Powell, amounting to $6341.47. The executor resisted payment on the ground the note had been paid, and was barred by the Statute of Limitations, but was fraudulently retained and presented for allowance by said Clark.

At the trial in the probate court of Pettis County, Clark was defeated. He appealed and took a change of venue to Cooper County, where the first trial resulted in a hung jury. A second trial at the May term, 1915, re-

sulted in a verdict and judgment against Clark. He appealed to this court, where the judgment was affirmed. Our opinion is found in 208 S. W. 31.

Powell's only heirs and devisees were his two children, Alice Powell, his daughter, a single woman about fifty years of age, and Ed Powell, his son. The son was married at the time of the father's death. The land in question was devised by his will to his daughter. The son died before this case was tried, leaving plaintiffs Willie Powell and Alice Powell Dowdy as his heirs.

After Clark had filed his claim in the probate court, and before trial thereof, he visited said Alice Powell, with a view of settling his claim with her. The result was the following agreement, was drawn up by Clark's attorney and signed by the parties; no one was present representing her in making or signing said contract:

"CONTRACT.

"This contract made and entered into this the 30th day of January, 1913, by and between Alice Powell of the first part and W. R. Clark of the second part, witnesseth:

"Whereas second party is the owner of a note for $200 given August 5, 1872, bearing ten per cent compound interest, upon which there have been several payments and upon which the amount now due is something over $6000: and

"Whereas he has taken steps to prove the same up against the estate of W. O. Powell, who gave the said note and made said payments thereon; and

"Whereas the first party and Ed Powell, her brother, are the only heirs, and legatees of said estate; and

"Whereas said brother, as well as the executor of said estate, desire to contest said note as barred by the Statute of Limitations, disputing some of the payments thereon; and

"Whereas the first party is acquainted with the facts and knows said debt to be valid and subsisting and just debt and desires that it be paid without litigation

and especially does she desire this if the said second party will make some deduction in the amount; and

"Whereas said party is willing to make a reduction to obtain a settlement and has agreed to take the sum of $4000 in full payment of said note; and

"Whereas the first party prefers to pay her half of said amount now, whether her brother does or does not, if she can avoid further liability.

"Now, therefore, in order to accomplish said result the first party has this day given to the second party her promissory note for $2,000, the one-half of the amount that said second party is willing to accept in full payment of said note now, and make it non-negotiable and given a deed of trust upon her interest in said land to secure the same;

"And in consideration thereof said second party hereby binds himself that if he cannot make settlement with said brother that he will proceed to have the same allowed against the estate of W. O. Powell and whenever he has collected said claim he will pay back the first party one-half of the amount he collects thereon and accept this note in lieu thereof.

"But it is distinctly understood that in consideration of this settlement, even if second party should by any means, after proper effort fail to get said claim allowed said first party will pay said note for $2,000 together with the interest thereon, at the end of said litigation and this contract is given by the second party to the first party to protect her from paying more than $2,000 to-wit the amount of the face of her note, mentioned above, out of her share of the estate.

"It is further agreed that if the executor and the brother of the first party, should desire and agree with the second party to arbitrate said matter, instead of going into court, the result of said arbitration shall have the same force and effect as a judgment in the probate court, and I hereby agree that they have my consent to arbitrate if they so desire.

"In witness whereof we the said parties hereunto set our hands this the 30th day of January, 1913, and to duplicate copies hereof.
"Signed

"W. R. CLARK,
"ALICE POWELL.

"Witness—W. H. PURCHASE."

The next day, January 31, 1913, the note and deed of trust, sought to be cancelled, were made and recorded.

Alice Powell instituted this suit, but died during its pendency, and it was revived by her administrator, Lester W. Carpenter.

W. H. Purchase testified: That Clark and Alice Powell were alone when he took their acknowledgment to the contract of settlement. He opened the paper, looked at it, and Clark said, "Do you have to read it? It is not necessary," or something to that effect, and he didn't read it. Alice Powell did not read it, nor was it read to her in the presence of witness.

H. B. Shain (circuit judge), R. H. Nelson, T. J. Pace, Clarence Johnson, W. E. Pfetcher, life-long friends, neighbors and acquaintances, not related, and plaintiff, William O. Powell, her nephew, and Mrs. Ed Powell, her sister-in-law, testified (over defendants' objections that they were not qualified to state their opinion) that Alice Powell did not have mental capacity sufficient to transact important business. She was easily influenced. She never had any business experience, except to buy groceries for the household, raise chickens, and exchange chickens and eggs for groceries. Most of these witnesses also stated that they had read the contract of settlement, which she made with defendant Clark, dated January 30, 1913, and that, in their opinion, she was not capable of understanding such a contract without independent advice.

Stanley Currier and W. A. Lessley testified that in the winter of 1912, while working for Ed Powell (over objection of defendants that the written contract could not be varied by parol), that they heard defendant Clark

say to said Ed Powell that he had come over to try to get a settlement out of him; that he obtained a settlement from Alice; that he got a note for $2,000 from Alice; that if Ed Powell beat the case, she wasn't to pay any more than he did, and if he didn't, she was to pay just her $2,000.

Mrs. Ed Powell and plaintiff William O. Powell also testified that they were present at negotiations for settlement between Alice Powell and defendant Clark, and he told her that if she would give him her note for $2,000 in settlement, she would not have to pay it if he did not win against her brother Ed.

Mrs. Ed Powell further testified: She was the widow of Ed Powell, the brother of Alice Powell. Knew Alice Powell all her life. Raised in that community. Relations pleasant. Lived with her and her father after her marriage for about six years. Raised on adjoining farm. She remembered the purported compromise between Alice Powell and defendant Clark on account of the claim Clark had against the Powell estate. Clark came to her house to see her husband about it several times. Clark said he had gone to see Alice on his own accord. He said he had talked Alice into settling her part. He didn't say anything about Alice sending for him. Cross-examination: Her maiden name was Lillie Spickard. She was Charley Spickard's sister. She is the mother of the plaintiffs Willie Powell and Alice Powell Dowdy. Her husband, Ed Powell, died in 1919, without a will, leaving said plaintiffs as his only children. Alice Powell died, leaving John Gilmore, her husband, surviving. She never had any children. Clark told her husband he had better settle, that they owed it. He wanted Ed to pay on this old note. He said he was sure of beating it. If Ed didn't have to pay anything, he had it fixed, so Alice wouldn't have to pay anything.

William O. Powell (one of the plaintiffs) testified: He was thirty years old. The son of Ed Powell, the grandson of William O. Powell, and the nephew of Alice Powell. He lived with his grandfather and Aunt Alice at the time of his grandfather's death, and continued to

live with his aunt for two years afterwards, until she married. They raised him. His Aunt Alice was a mother to him. His grandfather died in 1912. While he was living with his aunt, after his grandfather's death, defendant W. T. Clark visited his aunt's home several times. Clark said he came for a settlement of that note; if she didn't settle this note, it would ruin her, take everything she had. He was going to beat them in the lawsuit; there was no doubt about it. She never sent for Clark, so far as witness knew. Clark told her that if he made this contract with her "and my father didn't have to pay anything, she wouldn't have to pay anything." Sam Kendrick and Mrs. Etta Clark, wife of the brother of defendant Clark, also visited Alice Powell and talked to her, and gave her advice about this transaction several times. They told her to settle it. It would take all she had, if she didn't. Sam Kendrick was a cousin of Alice Powell, but not related to defendant Clark. Mrs. Etta Clark was not related to Alice Powell, but she was a near neighbor, a friend and member of the same church. His aunt had confidence in both Kendrick and Mrs. Clark. They were good neighbors. Witness was not present when the papers were signed by his aunt. He wrote a letter to Clark, which he thinks, was before the papers were signed. These conversations took place before that. Etta Clark and Sam Kendrick were there three or four times before the settlement was signed. Witness here identified the following as the letter he wrote to defendant Clark:

"Jan. 29-1913, Mr. Clark: Dear Sir: We have considered and talked this matter over and have decided to arbitrate, as we do not think we can get together. I started to your place this morning, and the roads being heavy, turned back. You will please let us know what you think about arbitrating. Yours truly, hoping this can be adjusted. Wm. Powell."

Witness further testified: Clark was there trying to get a settlement of this case, and trying to make us feel like he was going to take our home and everything we had. Witness unable to state whether it was before

or after the 29th of January that Clark said, if he didn't collect off of Ed, his aunt wouldn't have to pay; or whether it was before or after this contract was signed; but Clark did make the statement in the presence of Mrs. Etta Clark and Sam Kendrick.

Defendants first read in evidence the contract, heretofore set out, between defendant Clark and said Alice Powell, dated January 30, 1913.

Mrs. Etta Clark testified: She knew Alice Powell since they were little girls; lived near her. Always good friends. Helped take care of father of Alice Powell when he was sick. She was at Alice Powell's home, both before and after the settlement was signed. Met Sam Kendrick there once. She went there the first time with defendant Clark before the settlement was signed. That was in the fall before. Willie Powell was there, but not present during the conversation. Defendant Clark "announced the fact immediately that he came down to ask about the note, her father's note, you know." Alice said, that was all right. Defendant Clark asked her, if she remembered all about it, and of his being at her home and her father paying some money, and she said she did. She said he took dinner with them that day. He asked her, if she knew how much her father had paid him, and she said yes, $200. She said Jim Caldwell told her that Will (defendant Clark) said he would come any time and fix the note up; that it had not been settled. But why she didn't send for Clark, she didn't know, "just neglected to do it, and was sorry she didn't." Then they talked about settling the note. Alice said she wanted Will to settle with her out of court. She didn't want the note taken to court. They both agreed on Mr. Bagby, the administrator of the estate, to settle the note. Clark agreed to talk to Bagby, and when he came back he said Bagby didn't want to do that as administrator, but for them to go ahead and settle it, and it would be all right with him. They discussed other names to settle it, Will Powell of Sedalia, Sam Kendrick and Mont Kendrick. Sam Kendrick was Alice Powell's cousin, and Mont Kendrick is Will Clark's half-brother. She said she didn't

want them to settle it; didn't want relatives to have anything to do with it. Clark didn't suggest anyone. He said she might select them herself. He would do whatever was right. That was in the fall before the contract was entered into. Witness was not there when contract was signed, but Alice sent word to her that she wanted her to go with her to Mr. Purchase's to sign the contract, but when she got there the business had been attended to and they were starting. "They asked me to read the articles of agreement, but I refused." "But Will read it, and read it aloud; we all heard it; and they went on." Witness didn't want to read it, because it didn't concern her. Witness didn't go; she said they couldn't all go together, and witness would go home. Will Clark was there in his buggy and took Alice with him. "She didn't need me, I didn't think, and talked her out of it, was all." When Clark read the articles, Alice said she didn't want him to push her, she wanted plenty of time, and witness just said to her, "Alice, time is just what is the cause of you making this note." All parted in good feeling and went home. It wasn't necessary to use any influence to get her to enter into this settlement. She was anxious to settle. Witnesss didn't influence her to do it. She was a sensible woman and understood what she was doing, in the opinion of the witness. As compared with other women raised on a farm, "I think she was my equal, so you can judge." Witness had another conversation with Alice Powell in October, 1912, after death of her father, in which Alice Powell said she wanted to settle out of court, and wondered why Clark ever probated the note, they were expecting to pay it. Alice told witness to tell Clark to come down, and upon such invitation the witness and Clark went to see Alice Powell.

J. W. Rice, Charles Calvird, William F. Kearn, who bought some lumber from her once, J. R. Caldwell and J. M. Kendrick, neighbors, and who had known the Powells for many years, testified that Alice Powell had the average business intelligence of a woman; Rice saying, "a little better than the average of women."

Caldwell also testified: Before William O. Powell, the father died, a month or six weeks, witness had a conversation with Alice Powell as to his old Clark note. "I told her, that if I were her, I would have Will Clark come down there, while Mr. Powell was living. We always heard this note was in existence, and I would have three or four witnesses there, and see and have an understanding about this note. She said she would like to do it. She asked me if I would see Will Clark and ask him if he would come down. And I went and seen him, and he said he would come any time. I went back and told her, he would come any time she wanted him to."

Defendants then read in evidence the depositions of W. L. Calvert, a neighbor of years of acquaintance, who testified that Alice Powell was of average understanding and capacity. To the same effect were the depositions of Sam Kendrick, Aubrey Ragar, Will Kendrick, J. L. Ramsey and J. H. Ruffin. Ruffin also testified that defendant Clark was a man of unusual business qualities, looked after his own interests very closely, and that Alice Powell, after her father's death, was no match for Clark in a business transaction, as far as experience and ability were concerned, and that he hardly thought, that she could understand the significance of the contract of settlement by the mere reading of it over to her in the company of friends. But he thought that if the contract was read over to her carefully, paragraph by paragraph, she could understand it. He thought she had the capacity to understand things she had already agreed to. Without independent advice there was a possibility of her being overpersuaded.

Defendant W. R. Clark testified on his own behalf: He was the payee of the $200 note in question. Over plaintiffs' objection and exception, that he was an incompetent witness, because the other party to the contract, Alice Powell, was deceased, Clark stated: He never said, as testified to by young William O. Powell in his testimony, that he (defendant) stated in the presence of said William O. Powell to Alice Powell, that if he did not beat Ed, he would not collect anything off of her; that he

never made any such statements to anyone, or in the presence of Mrs. Ed Powell. Mrs. Ed Powell is mistaken.

S. A. Kendrick, testified: He was a cousin of Alice Powell, knew her all of his life. Knew defendant Clark all his life, distantly related. Was not present when the settlement between Alice Powell and defendant Clark was made. She sent word that Clark was coming down to try to settle, and for witness to come over. "I went to the house first, and I told her not to bid too high, to try and settle." Clark came in about that time. "I said, I couldn't make the settlement, they would have to settle it themselves, and I left the room. I went outside, and was not within hearing when they were discussing the settlement. Afterwards, they called me, and said they · had settled. I didn't see the figures. She remarked that she had settled with Will, and that she was glad they had settled; that she did not want her father's name dragged into court. I think she said something about Ed, and hoping he would settle his without a lawsuit. I think there was something said by her about worrying about the matter, and being tired 'of whipping the devil around a stump.' I didn't see the papers drawn up. I was there one evening when Mr. Clark and Mrs. Etta Clark were there. I think Alice and Mr. Clark left first, saying they were going to a notary public to have the papers concerning the settlement fixed. Clark never requested me to use my influence to get a settlement. My father's name was on the note, the $200 note, given by W. O. Powell to W. R. Clark. He died in 1890. I discussed the note with Mr. Clark, when the Powell estate was settled. My father told me before he died to have his name removed from the note, or have it settled, and I went to Mr. Clark and told him, if he wanted to collect the note, to do it now. He said that was all right, Mr. Powell was perfectly good. Never had any talk with Alice Powell on this original note. My object in the case was to advise her to make a settlement. I always advised her to do it without a lawsuit. At the time W. O. Powell's will was drawn, I was at his home.

They were talking about the stock, and I told Judge Shain I thought it was not worth while. I thought the Clark note would consume all that. I had always heard my father and mother speak of it. They thought it was running up too heavy on Uncle Bill, and thought he ought to have paid it long ago.''

Defendants then offered in evidence the testimony of ten and plaintiffs of five witnesses (including that of Charles Spickard), being the testimony of all the witnesses, as shown by the printed abstract of the record, in the prior suit in the probate court of defendant W. R. Clark against the administrator of W. O. Powell on said $200 note. We quite fully considered such testimony in our opinion in said cause, reported in 208 S. W. 31, to which we refer for the substance thereof.

I. After the lapse of twenty years from the maturity of a note, or the last proven payment thereon, or acknowledgment thereof by the debtor, there arises a legal presumption of payment, in the absence of such circumstances as the insolvency of the maker of the note, or his absence from the country, and the like. [Lawson, Law of Presumptive Evidence, chap. XV, p. 371 *et seq.;* Bobb v. Taylor, 184 S. W. (Mo.) 1028; Williams v. Mitchell, 112 Mo. 311; Cape Girardeau Co. v. Harbison, 58 Mo. 96.] This presumption is not conclusive, but may be overcome by evidence showing that the note has not been paid. [Bobb v. Taylor, supra.] But the presumption is a presumption of law. Among the many cases so holding, cited by Mr. Lawson in his treatise (p. 377), is a case decided by Chief Justice HOLT, 6 Mod. 22, where the learned chief justice says: "If a bond be of twenty years' standing, and no demand proved thereon, or good cause shown for so long forbearance upon *solvit ad diem,* I will intend it paid. From those cases, without going into a multitude of others, I think the conclusion irresistible, not only that twenty years affords a presumption of payment, but that that presumption, standing alone, is conclusive in the law, and is so to be declared by the court; and not

*(margin note: Presumption of Payment.)*

to be left to the jury to determine its effect.'' While
the presumption is rebuttable, ''the further we advance
beyond twenty years, we require more persuasive cir-
cumstances to rebut the legal presumption.'' [Lawson,
supra, p. 388.]

II.  The only payment made on said note of $200,
after it was executed in 1872, which has been satisfac-
torily proven in this case, was in March, 1885, when, the
Credits. evidence of Charles Spickard, as shown by our
opinion in the former case at pages 37 and 38
(whose reputation was, however, both impeached and
sustained), tended to show it was paid in full, and de-
fendant Clark claims $200 was then paid.  This was
twenty-seven years before it was presented for allow-
ance in the probate court.  The statement by the witness
S. A. Kendrick, that his father, who was on the note with
Mr. Powell, and who died in 1890, admitted he was liable
on the note, related to a time more than twenty years
before Mr. Powell's death.  Besides, the presumption is
not rebutted by the admission of non-payment by one of
two co-obligees.  [Lawson, supra, p. 400.]  The state-
ment of Mrs. Etta Clark that Alice Powell said they were
expecting to pay the note, cannot be considered as an
admission the note was unpaid, because she could not
know whether it was unpaid or not.  Her statement
would not be evidence the note was unpaid.  Besides
such statement was made in an effort to compromise
with said Clark.  The same is true of Alice Powell's
statement in the settlement contract as to the said note
being unpaid.  There was no other evidence in this case
as to the recognition of said note as unpaid by any of
the Powells not offered in the prior suit of defendant
Clark on said $200 note.  An examination of our opinion
in the prior suit, 208 S. W. l. c. 35, will show that the
only evidence of the payment of ten dollars on said note
in March, 1895, was that of Mr. Littlefield, whose testi-
mony, we held, was no evidence of such payment by
Powell.  We said, at page 35: ''We do not think that the
circumstances related by Mr. Littlefield constituted any

evidence whatever of the payment of ten dollars or that the note was a live obligation.'' So, there is no evidence in this case of the payment of five dollars by Mr. Powell on said note in March, 1904, as credited on said note by defendant Clark, except the evidence in the former case. In our said opinion, on page 36, we reviewed the evidence as to such payment showing that the witnesses were not disinterested, and that they said the money was paid on Sunday at church after services, whereas the credit on the note is March 1, 1904, which was on Tuesday. In commenting on this testimony in the former case, we, in effect, said (p. 36) that, in view of all the facts and circumstances, including the great lapse of time, forty years, without proceeding to collect said note during the life of said Powell, who was amply able to pay, the jury were fully justified in disbelieving the testimony as to the payment of five dollars on said note in 1904. We still adhere to that conclusion.

So that, if said note was not actually paid, which we need not determine, it was presumed to be paid prior to the death of said Powell by the lapse of more than twenty years from the last prior payment thereon, and such presumption is not rebutted by anything in the record. But, in any event, the evidence being insufficient to show any payments thereon within ten years, said note was barred by the Statute of Limitations and was not a legal claim against the estate of said Powell, and could not be, and as the sequel showed, was not established as a legal claim against said estate.

III. But it is said that it is not necessary that said claim should have been a valid claim; that it is sufficient, if it was made in good faith by said Clark, to support a compromise and settlement thereof. But in the view we take it is not necessary to pass on that question.

If said Alice Powell did not have sufficient mental capacity to understand the nature of the transaction it was void for that reason. The plaintiffs' evidence tended to show that she did not, which was disputed by that

of the defendants. It was mostly oral testimony, The

**Deference to Trial Court.** weight of it largely depended upon the character, intelligence, opportunity for observation, and various qualifications of the witnesses, which the lower court was in a better position to determine than an appellate court, which has no opportunity to see and hear the witnesses and observe their demeanor on the witness stand. It is a rule of this court in equity cases to defer somewhat to the finding of facts of the learned chancellor below, and unless we are satisfied that his conclusion is against the weight of the evidence, to adopt his finding as to the facts. The lower court in this case found all the issues for the plaintiffs, including, therefore, the issue as to the mental capacity of said Alice Powell to understand the nature of the transaction sought to be set aside. We are constrained to and do follow such finding, and decide that issue for the plaintiffs.

IV. Appellants, however, claim that the witnesses for plaintiffs gave no sufficient ground for their opinion as to mental incapacity of said Alice Powell to warrant the setting aside of said note and deed of trust; that they did not testify to any insane act or acts to show a weak mind on her part. We do not agree to this suggestion. They all knew her intimately from girlhood, and they spoke from their association and observation of her, which we have ruled is competent evidence of the fact. Indeed, they spoke of her mental condition more as a matter of fact, than as merely an opinion. The admissibility and weight of such testimony is too well established to require the citation of authority, but the language of this court in Appleby v. Brock, 76 Mo. l. c. 317-18, per HOUGH, J., is so appropriate to this case, that we quote therefrom the following:

"Besides, it does appear that, with one exception, the witnesses who testified to a want of testamentary capacity had adequate opportunity of observing and judging of the mental capacity of the deceased. Attesting

witnesses have always been permitted to express an
opinion as to the sanity of the testator, on the ground
that the law has made it their duty to inspect the tes-
tator's capacity, and the law presumes they did observe
and judge of it, while other witnesses were, by some
authorities, permitted to speak only as to facts.    But
as was well observed by GASTON, J., in Clary v. Clary, 2
Iredell, 78: 'If observation presumed, be a sufficient
ground for receiving in evidence the judgment of a wit-
ness supposed to be thereupon formed, it is not readily
conceivable that actual observation is an insufficient
ground to warrant respect for the judgment of a witness,
in fact formed upon it.'   And in that case it was held
that a non-professional witness is not to be restricted to
a recital of facts from which the jury may draw an in-
ference of sanity or insanity, but he may give his opinion
as to the sanity of a party as the result of his own
observations.    The doctrine of this case received the
approval of this court at an early day, in Baldwin v.
State, 12 Mo. 223, and has been re-announced in Crowe
v. Peters, 63 Mo. 434, and Moore v. Moore, 67 Mo. 192.
And the same rule obtains in other states.    In Dun-
ham's Appeal, 27 Conn. 192, it is said: 'The judgment of
a witness founded on actual observation, of the capacity,
disposition, temper, character, peculiarities of habit,
form, features or handwriting of others, is different
from, and more than a mere opinion of an expert.  It ap-
proaches to knowledge, and in fact is knowledge, so far
as the imperfection of human nature will permit knowl-
edge of these things to be acquired, and such knowledge
is proper evidence for the jury.'   .   .   .   The opinion
of an intelligent witness having adequate opportunity of
observing and judging, is the best testimony which can
be adduced; for no mere description of the acts, or
words, or tone of voice, or glance of the eye, or general
expression of the face, or manner or bearing of a per-
son whose mental condition is in question, can convey to
the jury the same impressions or indications of insanity

or mental debility, which they will create in the mind of a competent observer.''

Besides, the erratic conduct of said Alice Powell, who had never transacted. any business of consequence, in not following her brother, Ed Powell, and the administrator, Bagby, and her nephew, in reference to dealing with said claim, and suddenly going off by herself with said Clark and signing the elaborate contract of settlement without letting them know about it, tends itself to show that she had not the mental capacity to fully appreciate the nature of the transaction or to withstand the dominating force and influence of said Clark over her in making said settlement. Young Powell's letter to Clark, dated January 29, 1913, shows that up to that time she was unable to reach any agreement with Clark, yet the next day, without notifying her nephew, she went off with Clark alone and executed the contract of settlement. Evidently, this inexperienced maiden lady of ''weak mentality,'' as stated by plaintiff's witness, Judge Shain, and who suffered from ''nervous spells of some kind,'' as stated by her nephew, was not mentally strong enough, without aid, to resist the persistent and puissant defendant Clark in a business transaction, as stated by defendants' witness Ruffin, especially if aided by others, as the evidence shows he was. Ruffin further testified that he hardly thought she could understand the contract of settlement by the mere reading of it over to her in the company of friends, as appears from the testimony of defendants' witness Etta Clark was done by defendant Clark, but only if read over to her carefully, paragraph by paragraph, which we are satisfied was not done, because defendant Clark objected and prevented the justice, who witnessed their signatures or took their acknowledgment, from reading it to her.

There are other contentions of counsel why, under the law and the evidence, the judgment below should be upheld. But the conclusion we have reached and announced, concerning the lack of mental capacity of said

Alice Powell, disposes of this appeal, and we need not further prolong this opinion.

Finding that the court below arrived at the proper conclusion, its judgment ought to be and is affirmed. *Lindsay, C.,* concurs.

PER CURIAM:—The foregoing opinion by SMALL, C., is adopted as the opinion of the court. All of the judges concur; *James T. Blair, J.,* in result.