FRED L. JOHNSON v. WALTER T. JOHNSON, W. OSCAR JOHNSON, MINNIE GRAVES, FANNIE PITTMAN, ANNA M. GAUSE, and WALTER T. JOHNSON as Guardian and Curator of FRANK C. JOHNSON, an incompetent, Appellants.

In the Matter of the Final Settlement of W. T. JOHNSON, Administrator with the will annexed of the Estate of CHARLES F. JOHNSON, deceased.—No. 38792.—179 S. W. (2d) 605.

Division Two, April 3, 1944.

*Charles Farrar* and *Wm. L. Vandeventer* for appellants.

*Theodore Scott, James P. Hawkins* and *Roscoe C. Patterson* for respondent.

 ELLISON, J.—The appeals in these two cases were consolidated by the parties and are brought up on one record. The first is a suit to partition land in Dallas and Greene counties, aggregating about 7500 acres, 82 of the tracts belonging to Charles F. Johnson and 20 to his wife Rebecca P. Johnson, both deceased. That suit was brought by the respondent, Fred L. Johnson, as one of the seven children and heirs of the couple. The six other children were defendants and are appellants in that suit. The other proceeding was on exceptions filed by respondent Fred P. Johnson to the final settlement of the appellant Walter T. Johnson, as administrator c. t. a. of the estate of the said Charles F. Johnson, deceased.

The appellants' contention in the two cases was that the respondent had no undivided interest in either the land or the personal estate of his parents, because he was indebted to the estates of both in an amount exceeding his distributive share on eight promissory notes, four of which had been owned by his mother and four by his father. Their answer sounded in equity. The respondent's reply was that: (1) all the notes were barred under the statute of limitations; (2) the claims thereon were so stale as to raise a presumption of payment; (3) and they had been fully paid, satisfied and discharged by him and a complete accord and satisfaction had thereon, on March 11, 1940. The only substantial issues on this appeal are whether the evidence, and the weight thereof, was sufficient to sustain the chancellor's finding in favor of respondent.

As will be seen, there was no dispute about the authenticity, ownership and amount due on the notes; nor on appellants' right to have them off-set against the respondent's share in the land and estate, if they had not been discharged in one of the ways alleged by respondent. The notes were as follows:

NOTES BELONGING TO REBECCA P. JOHNSON, DECEASED

| Date | Maturity | Principal | No. of credits | Date and amt. last credit | | Amt. due Mch. 11, 1940, date of settlement |
|---|---|---|---|---|---|---|
| Mch. 3, 1903 | 1 year | $300.00 | 5 | Jan. 1, 1925 | $25.73 | $3727.67 |
| Mch. 10, 1906 | 90 days | 600.00 | 9 | Jan. 28, 1925 | 22.95 | 6463.35 |
| Jly. 3, 1908 | 30 " | 350.00 | 8 | Jan. 24, 1925 | 23.19 | 2728.78 |
| Mch. 24, 1911 | 60 " | 1200.00 | 6 | Jan. 30, 1925 | 8.93 | 8905.01 |
| | | 2450.00 | | | | $21,824.81 |

NOTES BELONGING TO CHARLES F. JOHNSON, DECEASED

| Date | Maturity | Principal | No. of credits | Date and amt. last credit | | Amt. due Mch. 11, 1940, date of settlement |
|---|---|---|---|---|---|---|
| Jan. 31, 1915 | Demand | 1000.00 | 24 | Jan. 21, 1925 | 27.19 | 5377.02 |
| Jan. 31, 1915 | " | 1000.00 | 24 | Jan. 25, 1925 | 22.95 | 5490.61 |
| Nov. 16, 1917 | " | 400.00 | 5 | Jan. 19, 1925 | 25.33 | 1808.99 |
| Aug. 1, 1918 | " | 297.55 | 1 | Jan. 1, 1925 | 25.30 | 1400.66 |
| | | 2697.55 | | | | $14,077.28 |

These eight notes all bore 8% compound interest and all except one were made payable to one or the other of two banks in Buffalo, Missouri. All were severally endorsed by the payees to Mr. or Mrs. Johnson, as the case might be, except the $300 note, which bore the notation that it was "taken up" by Mrs. Johnson on March 3, 1907. The four notes owned by her, along with her realty and other personalty, were devised by her will to her husband (with some entailments that are immaterial here). She predeceased him in August, 1915, long before the occurrence of the crucial events involved herein. All the credits except the last one on each of the eight notes were made soon after the date of the note, the latest of these earlier credits being in 1918. Then followed a long period of years without any credit until the last credits were entered in January, 1925, as shown above. It appears that all credits were for interest only. In nearly every case the last credit on each note was shown to be for a stated number of bushels of corn, or other grain, at $1 per bushel.

On March 22, 1918, respondent secured all of the above notes except the one for $297.55, which had not yet been executed, by a deed of trust on real estate and a stock of merchandise, as to which latter a release was entered a little over five years later in 1923. C. W. Smithpeter, former collector and deputy circuit clerk of Dallas county, testified that some 14 years later in 1937 the respondent and his father came to his office and were discussing respondent's indebtedness to the father. They asked Smithpeter to go to the recorder's office and examine the mortgage records. He did so and found the above deed of trust of March 22, 1918. On reporting back the respondent and his father engaged in a further discussion after which they agreed that respondent owed the father $1200.

The evidence shows the father, Charles F. Johnson was Dallas county's largest taxpayer and wealthiest man. He was 94 years old when he died on February 24, 1941, nearly a year after the alleged accord and satisfaction had been made between him and respondent. He was exacting about his financial affairs, even with ▮▮▮ his own children; and maintained his mental vigor until his last sickness a few weeks before his death. But in June, 1940, five of his children, the appellants here except Anna Gause, instituted an inquisition into his sanity. There were rumors that those children thought respondent and the husband of Anna Gause were robbing the old man's estate. These suspicions may have been directed to the settlement between him and respondent, though the evidence does not specifically show that. At any rate, the insanity proceeding was dismissed and the appellants do not claim any fraud or undue influence was practiced by respondent in making the settlement.

We do not find any evidence in the record as to what business the respondent was engaged in at the time the several notes were given. But it does appear that from 1920 to 1933 he and his father

and a brother were engaged in the contracting business at Buffalo, Missouri, and had a bank account carrying an average daily balance of $25,000 to $30,000. In March, 1927, the partnership declared a dividend, each of the three members receiving a check for $5000. On the same day respondent gave a check to his father for $4350, and four days later the father paid off a $4335 mortgage indebtedness on a farm belonging to respondent. J. M. Brackley said he was present in about March, 1927 or 1928 when respondent gave his father a check for something over $4000, and the father told respondent "I will send you them papers when I get able to go to town." Then the witness added that "it seemed like the father had been hunting for some papers in his lock box." In 1933 the brother withdrew from the firm and respondent and his father continued in the business until March 11, 1940, the date of the alleged accord and satisfaction. The bank account of that partnership had a balance sometimes running up to $13,000 and averaging $4000 or $5000.

The settlement of March 11, 1940 between respondent and his father took the form of a written contract and a bill of sale. The bill of sale recited that they desired to dissolve the partnership and have an accounting. Respondent paid the father $2000 as his half of the firm's cash balance; the father gave the son a bill of sale covering their contracting equipment and all partnership leases of real estate; and the son agreed to take care of outstanding accounts. The father further agreed to give the son a warranty deed to certain land in Greene and Taney counties, belonging to the partnership.

Then the fourth clause of the contract recited that the consideration for the transfer of the above real and personal property was $4200. It continued: "It is admitted and agreed that (the son) now owes (the father) the sum of $1300—one thousand dollars of which is evidenced by a note and secured by a mortgage on certain real estate, but said note is now lost and cannot be produced, and an additional sum of three hundred dollars paid by (the father) for (the son) in overdrafts—and it is agreed that the $4200 with the $1300 making a total of $5500, is to be evidenced by a note to be given on this date in said sum and said note is to be secured by a mortgage to be given by (the son) to the (father) on the (Greene county) real estate acquired by (the son) from (the father) under this contract and 165 acres of real estate in Dallas county, Missouri. It is further agreed and contracted that the deed of trust securing the lost note is to be released by (the father)."

Pursuant to that contract respondent executed the $5500 note and deed of trust to his father, and in May, 1942, when he received $3000 as his distributive share on a partial distribution of the father's estate, he paid it on the $5500 note. A search of the mortgage records of Dallas county made by a former Recorder of Deeds in 1942, disclosed that this $5500 mortgage and the one given by respondent in 1918

were the only ones ever executed by him, so far as appeared from those records.

There was also testimony from several witnesses with regard to statements made by the father following the execution of the above contract of settlement. A little over three months thereafter the father had counsel who were preparing to represent him in the insanity inquisition. These lawyers, having heard rumors that respondent and a son-in-law, Dan Gause, had been robbing his estate, asked the father about respondent's indebtedness to him. He told them "All that Fred (the respondent) owed him was that $5500 note." Respondent's wife was present at the time and she testified to the same thing. She further stated that on frequent prior occasions when she and respondent would meet the father, respondent would ask him if he had ever found the old notes; and that the father answered he had not, although he had looked everywhere; but he would always promise he would look further for the notes and try to locate them. Respondent's married daughter Vivien Daily said after the partnership settlement the old gentleman would come to respondent's coal office in Springfield. In July, 1940, she asked him how much respondent owed him and he answered $5500 was all.

Mrs. Zora Legan and her husband lived in the country south of Buffalo and had formerly kept house for respondent's father, and he frequently visited them afterwards. She said she had had numerous conversations with him about respondent's indebtedness. She recalled that several days after her birthday early in March, 1940 respondent and his father had a conversation at her home and the latter said "Fred is indebted to me a lot, but the old boy is coming to the front now. He only owes me $5500." She testified she had helped the old gentleman hunt for the lost notes a lot of times and he declared: "I am giving him credit on the ledger, and my name is signed to it. They can't beat the boy out of it." It appears that before the trial the ledger was lost.

The record is silent as to where the eight notes were through the years. When the mother's estate was administered in 1916 the four notes owing by the respondent to her were not mentioned in the inventory or final settlement. When the father's estate was administered in 1941 the eight notes were not inventoried. In fact it was not until May, 1942, after the administrator had made his final settlement, that the notes were produced and an additional inventory filed. The only testimony adduced by the appellants on that question came from Mrs. W. C. Johnson, the wife of one of them, who said the first time she saw the notes after the father's death was when another of the appellants, Mrs. Graves, brought them to her home. That was probably two or three weeks after the old man's death. Mrs. Graves did not testify, and it was not disclosed where she got the notes. Mrs. Johnson said she misplaced "the papers" and forgot about having

them for a month or two. Then she sent them to the attorney for the estate.

Appellants contend all this evidence was vague and insubstantial. They assert the settlement contract of March 11, 1940 was purely a partnership transaction; had nothing to do with respondent's long standing personal indebtedness to his father; and did not refer to the eight notes. The recital in the contract was that respondent then owed his father $1300, itemized as $1000 evidenced by a note secured by a real estate mortgage, the note being lost, and $300 paid by the father on the son's overdrafts. This description, say appellants, did not disclose whether the $1000 was the principal of the note, or the interest, or both; and it did not show the date of the note, to whom it was payable, what real estate was covered by the mortgage, or where the latter was recorded. And as to the note being lost, appellants assert that statement in the contract could not have referred to any of the eight notes here involved—because they were not lost, and none of them were for overdrafts.

With regard to the testimony that outside of the $5500 mortgage given by respondent to his father at the time of their partnership settlement on March 11, 1940, the mortgage records of Dallas county showed only one other mortgage ever given by respondent, that being the mortgage of March 22, 1918, which did secure seven of the eight notes here involved. Appellants say this does not prove the latter mortgage was the one referred to in the settlement contract, because respondent may have given some other mortgage in some other county securing a note on which $1000 was due, as mentioned in the contract.

And they further argue the evidence that respondent paid his father $4350 on March 3, 1927 (when the contracting partnership declared a $5000 dividend to each partner) shows on its face the $4350 payment was not made by respondent to apply on his personal indebtedness to his father, but was money which the father used four days later in paying off a mortgage on respondent's farm. They say this is true notwithstanding the witness Brackley testified he was present when that transaction (possibly or probably) occurred; where the father said he would send "them papers" to respondent as soon as he could get to town; and that "it seemed like" the father had hunted for some papers in his lock box, thus indicating the payment then made called for some papers in the father's possession, rather than in the possession of a man named Sturgeon who was the holder of the mortgage on respondent's farm.

On this last point, we think appellants' view of the evidence as to the $4350 payment is more likely to be correct. But otherwise we cannot agree with appellants. It can hardly be thought the father would have made the partnership settlement of March 11, 1940, admitting the respondent owed him only $1300, if at the time respondent really owed him personally and additionally the eight notes

on which nearly $36,000 was then due. Neither would he have repeatedly said thereafter that the $5500 mortgage note respondent gave him in the partnership settlement was *all* that respondent owed him. The father was wealthy and in his last years. It is not unnatural that he would have wanted to settle up *all* his business affairs with respondent involving these promissory notes running back as far as 37 years. We are not justified in overturning the chancellor's findings.

■ This is the conclusion we have reached on all the facts. But the parties have raised some legal questions bearing on the probative value of the testimony for respondent. Appellant says the burden of proof was on respondent to establish his pleaded defense of payment (which is true); and that at most he has only shown *part* payment of the notes. On that point appellants cite Wayland v. Pendleton, 337 Mo. 190, 194(1), 85 S. W. (2d) 492, 494(1). That case sustains them on the proposition that an acceptance of partial payment in full settlement of a debt is not good even as an accord and satisfaction, because unsupported by a consideration.

But there are two answers to that, it seems to us. The first is that the contract of settlement recited the respondent's $5500 payment by note and mortgage was in *full* of his existing debt; and the father so declared afterwards. The second answer is that in the Wayland case the debt compromised was valid, outstanding and subject to collection, whereas here on appellants' own theory no payment had been made on any of the eight notes since January, 1925, more than 15 years before the settlement in March, 1940. The notes were therefore barred by limitation under Sec's 1013 and 1017, R. S. Mo. 1939, Mo., R. S. A. secs. 1013, 1017; and respondent could make a valid compromise thereon. Respondent does not dispute appellants' contention that under the doctrine of equitable retainer they would otherwise have had the right to charge respondent's indebtedness to the estate of his father (or both his father and mother) as an offset against his distributive share in the land involved in the partition suit —although the debts were barred by limitation, Duffy v. Duffy, 155 Mo. 144, 147, 55 S. W. 1002, 1003; Thompson v. McCune, 333 Mo. 758, 767(5), 63 S. W. (2d) 41, 45. But since the deceased father had made a valid compromise settlement of the outlawed notes before his death, they would no longer be obligations due the estate. For the statute of limitations was binding on him when he made it.

■ Respondent's reply also pleaded there was no equity in appellants' claim on the notes; and that they were so old and stale as to make the claim unconscionable. On this point he cites Carpenter v. Kendrick, 299 Mo. 95, 110, 252 S. W. 646, 650, which holds that after the lapse of twenty years from the maturity of a note, or the last *proven* payment thereon, or acknowledgment thereof by the debtor, there arises a legal presumption of payment (with certain exceptions).

The last note was dated August 1, 1918, payable on demand. All the notes had run 20 years past maturity by the end of 1938. But all bore credits in January, 1925. Twenty years past that month would run to 1945. In other words the twenty year period from the dates of those credits would not have expired when appellants' answer made claim on the notes in 1943.

To meet that situation, respondent's brief argues the credits were not binding and did not prove themselves as to date because they were in the handwriting of respondent's father, the owner of the notes, and therefore self-serving, citing Caneer v. Kent, 342 Mo. 878, 883(II), 119 S. W. (2d) 214, 217(4). Appellants answer that this theory of defense was not well pleaded in respondent's reply; and that the reply all the way through was drawn on the theory that respondent had made payments on the notes which reduced his indebtedness to the $1300 stated in the settlement contract of March 11, 1940.

There does seem to be some inconsistency in respondent's position in that regard. But one thing is certain. If the credits on the notes purporting to have been made in January, 1925, had not in fact been made at that time, then the notes were all the more barred by limitation when respondent and his father made the settlement contract of March 11, 1940. If the credits were correct the notes were still barred at the time of the settlement. Respondent ▇▇▇ could waive the statute of limitations for a consideration. There was no defect in the pleading of the accord and satisfaction in respondent's reply; at least appellants did not object to the introduction of the contract of settlement on that ground; but only on the theory that the contract was immaterial because it did not cover the eight notes here involved. We think it did. The contract and the $5500 note and mortgage given pursuant thereto made an account stated, as the Caneer case says, 342 Mo. 1. c. 881(I), 119 S. W. (2d) 1. c. 216(I). For these reasons the finding and decree of the chancellor is affirmed. All concur.